UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Tamara Natasha Lindo,

                              Plaintiff,

              -against-

Andrew M. Saul,[1]

                              Defendant.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__9/30/2019____

1:18-cv-01070 (SDA)

OPINION AND ORDER

**STEWART D. AARON, UNITED STATES MAGISTRATE JUDGE:**

On February 7, 2018, Plaintiff Tamara Natasha Lindo ("Plaintiff" or "Lindo") filed this action pursuant to § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits. (Compl., ECF No. 1.) Presently before the Court is Plaintiff's motion, pursuant to Fed. R. Civ. P. 12(c), for judgment on the pleadings (Pl. Not. of Mot., ECF No. 16 & Pl. Mem., ECF No. 17), the Commissioner's cross-motion (Def. Not. of Mot., ECF No. 20 & Def. Mem., ECF No. 21) and Plaintiff's reply. (Pl. Reply, ECF No. 22.)

For the reasons set forth below, Plaintiff's motion is GRANTED, the Commissioner's cross-motion is DENIED, and this action is remanded for further proceedings.

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the Court recommends substituting the current Commissioner of Social Security, Andrew M. Saul, for Nancy A. Berryhill, who was the Acting Commissioner on the date this action was commenced.

**BACKGROUND**

I.      **Procedural History**

On October 30, 2013, Lindo filed an application for disability insurance benefits ("DIB"),[2]

with a disability onset date of December 29, 2012. (Administrative R. ("R."), ECF No. 13, at 29,

229-35.) The Social Security Administration ("SSA") denied Lindo's application on December 20,

2013 and Lindo timely requested a hearing before an Administrative Law Judge ("ALJ"). (R. 115-

26, 127-28.) Hearings were held before ALJ Elias Feuer on November 3, 2015 and March 15, 2016.

(R. 45-73, 74-102.) In a decision dated October 3, 2016, ALJ Feuer found Lindo not disabled.

(R. 26-39.) On November 22, 2016, Lindo, through her attorney, requested review of the ALJ's

decision by the Appeals Council. (R. 219-22.) However, the Appeals Council denied her request

for review on December 5, 2017. (R. 1-7.) This action followed.

II.     **Non-Medical Evidence**

Lindo was born in 1974 and was 38 years old on the alleged onset date. (R. 37.) The record

is inconsistent as to Lindo's educational background; although her November 7, 2013 Disability

Report states that she completed twelfth grade, Lindo testified that she had only in fact

completed tenth grade. (R. 48-49, 257, 937.) Accordingly, ALJ Feuer considered Lindo as having a

limited education, up until the tenth grade. (R. 38.) Lindo's past relevant work was as a home

health aide. (R. 257.)

---

[2] To qualify for DIB, a claimant must be both disabled and insured for benefits. 42 U.S.C. § 423(a)(1)(A) & (C); 20 C.F.R. §§ 404.101, 404.120 & 404.315(a). The last date a person meets these requirements is commonly referred to as the date last insured ("DLI"). Lindo's DLI is December 31, 2017. Therefore, to qualify for benefits, she must prove her disability began on or before December 31, 2017.

III.   **Medical Evidence**

   A.   **Montefiore Hospital Emergency Department**

On December 30, 2012, Lindo was seen in the emergency room of Montefiore Hospital for back and right hip pain after falling down stairs while at work the day before. (R. 335-40.) The physician notes report that Lindo was able to ambulate, experienced moderate pain, no swelling, and minimal dysfunction. (R. 336, 517.) Radiographs of Lindo's right hip showed "[n]o acute fracture or dislocation" with "[m]ild degenerative changes." (R. 341.) Lindo was released in "good" condition with instructions to follow up with her treating physician. (R. 340.)

Lindo returned to the Montefiore Hospital emergency room on April 7, 2013 complaining of pain in her back and right hip which radiated to her right knee related to her fall in December 2012. (R. 326-34, 490.) A physical examination showed severe pain, difficulty ambulating, moderate swelling and "partial [weight] bearing" dysfunction. (R. 328.) Like the ones taken in December, the April right hip radiographs showed "[n]o acute fracture or dislocation" with "[m]ild degenerative changes." (R. 333.) Lindo was treated and released on April 8, 2013 in "fair" condition, with a prescription for Tylenol with Codeine. (R. 503.)

   B.   **Joseph O. Walters, M.D.**

On January 2, 2013, Lindo saw Dr. J.O. Walters at which time he wrote a letter opining

that "Ms. Lindo is suffering with lumbar radiculopathy[3], hip bursitis[4] and knee tenosynovitis.[5] As a result, she has been disabled from December 31, 2012." (R. 359.)

On February 13, 2013, Dr. J.O. Walters wrote that he had seen Lindo on January 2, 2013,[6] following her fall on December 29, 2012 reporting that she "suffered severe low back, right hip, thigh and right knee pain," as well as "radiation of her low back pain to her right thigh and lower extremity; right knee instability." (R. 344.) Dr. J.O. Walters' physical exam showed back flexion "to 70 degrees," a "moderately severe para-lumbar spasm," "[s]traight leg raising[7] 40 degrees on the left and 30 degrees on the right," "moderately severe right knee tenderness" with "flexion extension . . . 50 percent decreased." (*Id.*) Dr. J.O. Walters diagnosed:

1) Lumbar Radiculitis R/O Discogenic Disease[8]
2) Right Hip Bursitis
3) Right Knee Tenosynovitis
4) Exacerbation of Hypertension

(R. 344.) Dr. J.O. Walters ordered an analgesic, lumbar spine and right knee MRIs and referred

---

[3] Radiculopathy is a "disease of the nerve roots." *Dorland's Illustrated Medical Dictionary* ("Dorland's") 1571 (32nd ed. 2012). Lumbar radiculopathy is a "disease of the lumbar nerve roots, such as from a disc herniation or compression by a tumor or bony spur, with lower back pain and often paresthesias[,]" an "abnormal touch sensation." *Id.* at 1383, 1571.

[4] Bursitis is inflammation of the bursa, which is a "sac or saclike cavity filled with a viscid fluid and situated at places in the tissues at which friction would otherwise develop." Dorland's at 262, 264. Bursitis is "occasionally accompanied by a calcific deposit in the underlying tendon." Dorland's at 264.

[5] Tenosynovitis is defined as "inflammation of a tendon sheath." Dorland's at 1882.

[6] Dr. J.O. Walters' letter to the State Insurance Fund appears to have erroneously stated that his first visit with Lindo occurred on January 2, 2012.

[7] Straight leg raising "is a means of diagnosing nerve root compression, which can be caused by a herniated disc. The patient lies flat while the physician raises the extended leg. If the patient feels pain in the back at certain angles (a 'positive test'), the pain may indicate herniation." *Moore v. Astrue*, No. 07-CV-05207, 2009 WL 2581718, at *2 n.7 (E.D.N.Y. Aug. 21, 2009) (internal citation omitted).

[8] "Discogenic disease or degenerative disc disease is disease or degeneration of the intervertebral discs." *Ames v. Astrue*, No. 11-CV-01775, 2013 U.S. Dist. LEXIS 21745, at *4 n.7 (M.D. Pa. Feb. 4, 2013).

*Lindo* to an orthopedic and physical therapy. (R. 345.)

### C.    Doshi Diagnostic Imaging Services – February 12, 2013 MRI

On February 12, 2013, Lindo underwent a magnetic resonance image ("MRI") of her lumbosacral spine.[9] (R. 483, 484.) The image showed "disk herniation at L5-S1[10] as well as multiple disk bulges." (R. 483-85.)

### D.    William J. Walsh Jr., M.D. May 20, 2013 Orthopedic Examination

Dr. William Walsh, a board-certified orthopedic surgeon, performed an orthopedic examination of Lindo on May 20, 2013 in connection with her workers' compensation claim. (R. 347-52.) Lindo reported that she was being treated conservatively, she was waiting on approval for injections, and that her condition had improved. (R. 348-49.) She complained of lower back, bilateral hip and right knee pain. (R. 349.) Dr. Walsh assessed a full range of motion of the lumbar spine, no tenderness upon palpation, negative straight leg raise testing, full strength, normal reflexes, and sensation within normal limits. (R. 349-50.) Heel-toe-walking was negative, and Lindo was able to sit comfortably, remove her shoes without difficulty, move her body freely during the examination, and dress, undress, and get on and off the examination table without assistance. (R. 349-50.) Lindo retained the full range of motion of her right knee and left hip. (R. 350.) She exhibited swelling in the right knee and a McMurray's test[11] was positive. (*Id.*)

---

[9] Lumbosacral refers to the lumbar and sacral regions of the spine. Dorland's at 1076.

[10] "A normal human vertebral column consists of thirty-three vertebrae labeled according to their position and region (in descending order, cervical ('C1' through 'C7'), thoracic ('T1' through 'T12'), lumbar ('L1' through 'L5'), sacral ('S1' through 'S5') and coccygeal ('Co1' through 'Co4')). The fifth lumbar vertebra, for example, is labeled 'L5.' The space between the fifth lumbar and first sacral vertebrae, for example, is labeled 'L5-S1.'" *Friedman v. Astrue*, No. 07-CV-03651, 2008 WL 3861211, at *2 n.4 (S.D.N.Y. Aug. 19, 2008) (citing *Dorland's Illustrated Medical Dictionary* 2079 (31st ed. 2007)).

[11] A McMurray's test is a use to assess the presence and extent of knee instability. *See* Dorland's at 1894.

Dr. Walsh assessed that Lindo's lumbar spine sprain/strain was resolved, her right hip sprain was resolved and her right knee strain was resolving, leaving her with a "mild orthopedic disability of 25%." (R. 351.)

###    E.    Total Radiology at Bainbridge Ave MRI – July 3, 2013 MRI

On July 3, 2013, Lindo received an MRI of her right knee which showed a marginal osteophytosis[12] and mild articular chondrosis,[13] lateral patellar subluxation[14] and mild tricompartmental joint space narrowing. (R. 486.) The MRI did not show a meniscus tear. (*Id*.)

###    F.    Wilson Orthopedics – 2013 Records

Upon referral by Dr. J.O. Walters, Lindo was treated by several doctors associated with the Wilson Orthopedics practice: Drs. Arnold B. Wilson, Board Certified Orthopedic Surgeon; Steven Renzoni, Board Certified Orthopedic Surgeon; and Sonali Lal, Board Certified in Physical Medicine and Rehabilitation.

Lindo first saw Dr. Wilson on June 6, 2013, who observed tenderness to palpation of the lumbosacral junction in the lower back, some tenderness of the right sciatic region, and moderate pain on the right lower extremity upon straight leg raising; Lindo's right hip exhibited the full range of motion. (R. 482.) Her right knee was tender about the medial joint line, she had full extension, and flexion to 120 degrees. (*Id*.) Lindo was pursuing physical therapy but complained of persistent pain in the right knee and pain in the lower back radiating down the right leg. (*Id*.)

---

[12] Osteophytosis is "a condition characterized by the formation of osteophytes." Dorland's at 1348. An osteophyte is "a bony excrescence or osseous outgrowth." *Id*.

[13] Chondrosis, or "cartilage deterioration, "is the softening or loss of smooth cartilage, most frequently that which covers the back of the kneecap." *See* Patellofemoral Chondrosis, *Patellofemoral Online Education*, at 1 (last visited Sept. 26, 2019) https://www.patellofemoral.org/pfoe/PDFs/PF_Chondrosis.pdf.

[14] Subluxation is "an incomplete or partial dislocation." Dorland's at 1791.

X-rays of the right knee showed no acute abnormalities nor degenerative disease. (*Id*.) After review of the diagnostic imaging, Dr. Wilson diagnosed low back pain with right sciatic radiculopathy and internal derangement[15] of the right knee with symptoms "suggestive of medial meniscal tear" noting that surgery was likely. (R. 483.) Dr. Wilson regarded Lindo as "disabled," ordered an MRI of the knee, EMG testing, recommended continued therapy and referred Lindo to Dr. Adin for pain management and Dr. Lal for an evaluation. (*Id*.)

Lindo next was seen by Dr. Wilson on June 27, 2013, who again remarked on Lindo's complaint of "pain in her right knee" and "pain in her lower back radiating into the right hip." (R. 481.) The rest of his examination and assessment was unchanged from June 6, 2013. (R. 481.) Dr. Wilson again ordered an MRI of Lindo's right knee, an EMG and pain management and physical therapy. (*Id*.)

On July 25, 2013, Dr. Renzoni examined Lindo as a follow up to her July 3, 2013 right-knee MRI. (R. 480.) She had mild tenderness in the right knee without effusion, which was mostly anterior with kneeling and rising. (*Id*.) Dr. Renzoni observed "good motion" of Lindo's right knee and noted that Lindo needed to be seen by Dr. Adin of pain management and needed physical therapy for the knee. (*Id*.) Dr. Renzoni also assessed mild degenerative arthritis in the right knee and a lateral patellar subluxation, and lower back pain with disc herniation. (*Id*.)

Lindo was seen by Dr. Lal on July 30, 2013 and complained of sharp shooting low back pain radiating down her right side. (R. 476.) Lindo stated that the pain was aggravated by sitting and bending. (*Id*.) On examination, Lindo's range of motion was decreased by 25% on forward

---

[15] Derangement is "disarrangement of a part or organ." Dorland's at 493.

flexion and lateral rotation. (*Id*.) She exhibited tenderness in the "lower lumbar paraspinals[16] and quadratus lumborum.[17]" (*Id*.) Dr. Lal's impression was right knee degenerative arthritis and low back pain with disc herniation. (*Id*.) Dr. Lal recommended EMG testing and placed Lindo on a Medrol Dosepack[18] and Tramadol.[19] (*Id*.)

On August 22, 2013, Dr. Wilson reported examining Lindo. (R. 479.) Lindo stated that she was currently in therapy for her lower back but still experienced discomfort in her back radiating down her right leg, had not begun therapy for her right knee, and had discontinued the Medrol Dosepack. (*Id*.) On examination, she exhibited mild tenderness through the anterior, lateral, and medial joint lines and through the patellofemoral[20] joint.(*Id*.) Muscle tone in her quad was poor. (R. 479.) Straight leg testing was positive on the right. (*Id*.) She exhibited diffuse tenderness in the lumbar spine. (*Id*.) Dr. Wilson diagnosed patellar subluxation with underlying degenerative joint disease of the right knee and lower back pain with herniated discs and foraminal stenosis.[21] (*Id*.) He recommended physical therapy for her knee as well as her back, referred her to Dr. Adin for pain management, and prescribed Mobic.[22] (*Id*.) Dr. Wilson stated that Lindo "remains

---

[16] The "paraspinals" are muscles that run parallel to the spine. *See* Dorland's at 1381.

[17] The quadratus lumborum muscle (musculus quadratus lumborum) is a lower back muscle that flexes the lumbar vertebrae laterally. *See* Dorland's at 1209.

[18] Medrol is used to relieve inflammation and to treat certain forms of arthritis. *See Medline Plus*, (last visited Sep. 21, 2019) http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682795.html.

[19] Tramadol is a narcotic-like pain reliever that is used to treat moderate to severe pain in adults. *See Drugs.com*, (last visited Sep. 21, 2019) https://www.drugs.com/search.php?searchterm=tramadol&a=1.

[20] Patellofemoral means "pertaining to the patella and the femur." Dorland's at 1395.

[21] "Foraminal stenosis" is the "narrowing or tightening of the openings between the bones in your spine. These small openings are called the foramen. Foraminal stenosis is a specific type of spinal stenosis." *See Healthline*, (last visited Sep. 21, 2019) https://www.healthline.com/health/foraminal-stenosis.

[22] Mobic is a "nonsteroidal anti-inflammatory drug." *See Drugs.com*, (last visited Sep. 21, 2019) https://www.drugs.com/search.php?searchterm=Mobic&a=1.

disabled and out of work." (*Id*.)

On September 6, 2013, Lindo returned to Dr. Wilson, continuing to complain of right knee pain. (R. 477.) She had started therapy, but had only attended one appointment. (*Id*.) Lindo had good motion in the knee, but was mildly tender through the lateral aspect of the patellofemoral joint. (*Id*.) Muscle tone in the quad remained poor. (*Id*.) Dr. Wilson's impression was "patellofemoral syndrome" and "herniated disks in the lumbar spine." (*Id*.) Dr. Wilson recommended Lindo continue physical therapy, take anti-inflammatories and work to improve her quad strength. (*Id*.) Dr. Wilson assessed that Lindo is "totally disabled." (R. 478.)

On September 17, 2013 Dr. Lal of reported that she saw Lindo, "complaining of low back pain . . . sharp shooting in nature, increases with sitting and bending" with the pain being a 4 out of 10. (R. 346.) Dr. Lal noted "[d]ecreased forward flexion by 50%, decreased lateral rotation of lumbar spine by 25%." (*Id*.) Dr. Lal's impression was "[l]ow back pain, lumbar disk disease and lumbar radiculopathy." (*Id*.)

### G.      William J. Walsh Jr., M.D. October 21, 2013 Orthopedic Re-Examination

Dr. Walsh performed a second orthopedic examination of Lindo on October 21, 2013 in connection with her workers' compensation claim. (R. 353-58.) Dr. Walsh observed that Lindo ambulated with a normal gait. (R. 355.) Lindo stated that her symptoms have worsened and complained of pain with flexion of her lumbar spine. (*Id*.)

She exhibited tenderness to palpation on her lumbar spine at L3-L5. (R. 355.) Range of motion was limited to 45 degrees of flexion, 20 degrees of extension, and 20 degrees of lateral bending. (R. 355.) She exhibited tenderness over the medial aspect of the right knee and McMurray's test was positive. (R. 356.) Dr. Walsh assessed that Lindo's lumbar spine strain was

"resolved with residuals," her right hip strain was resolved, and right knee internal derangement was resolving; he reiterated his prior assessment of "a mild orthopedic disability of 25%." (R. 357.) The doctor also opined that Lindo "is capable of working sedentary duties at this time with restrictions to be placed on no bending, kneeling, squatting or climbing stairs." (*Id*.)

On the date of Lindo's second orthopedic examination with Dr. Walsh, she completed a Workers' Compensation Questionnaire form in which she stated that she could walk one block, could stand for 45 minutes before having to sit, and could sit two hours before having to change positions because of pain. (R. 886.) Lindo additionally reported that she could drive for 45 minutes. (*Id*.)

**H.    Health East Surgical Center – Epidural Injections**

On November 27, 2013 and March 19, 2014 Dr. David Adin, D.O. performed a right transforaminal[23] epidural injection in the L5 nerve root to treat "[l]umbar disc disruption with radiculopathy." (R. 892-93, 896-97.)

**I.    William J. Walsh Jr., M.D. March 31, 2014 Orthopedic Re-Examination**

Dr. Walsh performed a third orthopedic examination of Lindo on March 31, 2014 in connection with her workers' compensation claim. (R. 864-69.) Lindo complained of constant lower back, right hip, and right knee pain with stiffness and aching that moved around and was aggravated by movement. (R. 866.) Upon physical examination, Dr. Walsh again noted a normal gait and no difficulty moving, changing, and ascending and descending the examination table. (*Id*.) Lindo exhibited mild tenderness upon palpation over L3-S1. (*Id*.) Range of motion was limited

---

[23] Transforaminal is "through or across a foramen." Dorland's at 1952. Foramen is "a natural opening or passage, especially one into or through a bone." *Id*. at 729.

to 40 degrees of flexion and 20 degrees of extension and lateral bending, but straight leg raise testing was negative. (*Id*.) She exhibited tenderness to palpation over the medial aspect of the right knee and a positive McMurray's test. (R. 867.) Dr. Walsh's diagnosis was unchanged from October 2013. (*Compare* R. 868 *with* 357.) He opined that she was "capable of working with restrictions to be placed on no climbing stairs, no bending and no heavy lifting over 25 lbs." (R. 868.)

On the date of Lindo's third orthopedic examination with Dr. Walsh she completed a Workers' Compensation Questionnaire form in which she stated that she could walk one block, could stand for 30 minutes before having to sit, and could sit two hours before having to change positions because of pain. (R. 873.)

J. **Health East Surgical Center – Epidural Injections**

On May 21, 2014 and July 9, 2014, Dr. Adin treated Lindo's "[f]acet-mediated low back pain," with "medial branch blocks of the bilateral L3 through L5 dorsal primary rami" epidural injections. (R. 894-95, 898-99.)

K. **William J. Walsh Jr., M.D. July 7, 2014 Orthopedic Re-Examination**

Dr. Walsh performed a fourth orthopedic examination of Lindo on July 7, 2014 in connection with her workers' compensation claim. (R. 791-96.) The doctor again noted that Lindo ambulated with a normal gait, could move freely, ascend and descend the examination table, and change without difficulty. (R. 793.) She exhibited mild tenderness upon palpation over L4-S1. (*Id*.) Range of motion was limited to 40 degrees of flexion and 20 degrees of extension and lateral flexion, and Lindo complained of pain with flexion. (R. 793-94.) The doctor assessed a resolving lumbar spine strain/sprain, an unspecified right hip condition that was resolved by history, and

internal derangement of the right knee that was also resolved. (R. 795.) The doctor again assessed "a mild partial orthopedic disability of 25%." (*Id*.)

On the same date, Lindo filled out a Workers' Compensation Questionnaire Form. (R. 858-61.) Lindo stated that she could walk for approximately one hour, and half a mile in distance, she could stand for 20 minutes before sitting, and she could sit two hours before changing positions. (R. 860.) Lindo also claimed that as of that date, she was "worse" compared to the initial injury. (R. 861.)

**L.      Health East Surgical Center – Epidural Injections**

On September 17, 2014, Dr. Adin performed an additional "medial branch blocks of the bilateral L3 through L5 dorsal primary rami" epidural injection. (R. 912-13, 948.) Dr. Adin gave Lindo a subsequent "contrast-enhanced caudal epidural steroid and anesthetic injection" on October 15, 2014. (R. 947.)

**M.      Samuel R. Walters, M.D.**

On January 6, 2015, Dr. S.R. Walters completed an IM Consult Report. (R. 814-17.) His physical examination findings included mild lower back tenderness and spasm, positive straight leg raise testing, positive heel walk testing, positive Kemp's testing, and full range of motion in the back and hip, except for reduced right rotation (25 degrees instead of 30 degrees). (R. 815.) The doctor also noted decreased sensation in the lower back, but no muscle fatigue or weakness. (*Id*.) Dr. S.R. Walters assessed a lumbar spine strain and disc herniation (causing pain), hip pain, and a knee sprain, and checked a box indicating that Lindo was "presently disabled from all gainful employment and will be re-examined in 4 weeks." (R. 816-17.)

Physical therapy notes authored by Dr. S.R. Walters show that Lindo consistently

complained of pain, stiffness and numbness during visits between January 8, 2015 and April 2, 2015. (R. 797-803.) Moreover, physical therapy notes from February 12, 2015 indicate "low back pain increased in cold weather," "numbness," "knee stiffness" and "pain." (R. 799.) On March 26, 2015 Dr. S.R. Walters reported that Lindo exhibited "severe" "lower back tenderness and spasms" noting that she is "unable to sit" and took note of an "exacerbation of low back symptoms." (R. 805.) On the same date, Dr. S.R. Walters referred Lindo to Dr. Olsewski for spine surgery.[24] (*Id*.)

On March 24, 2015, Dr. S.R. Walters performed EMG and nerve conduction testing which revealed evidence of L5-S1 radiculopathy. (R. 811.)

**N.     Health East Surgical Center – Epidural Injections**

On April 8, 2015, Dr. Adin treated Lindo's "[l]umbar radiculopathy," with a "contrast-enhanced caudal epidural steroid and anesthetic injection." (R. 946.)

**O.     Richard D. Semble, M.D. April 14, 2015 Independent Medical Orthopedic Report Addendum**[25]

On February 9, 2015, Dr. Semble, Diplomate Board-Certified Orthopedic Surgeon, performed an independent medical orthopedic examination in connection with Lindo's workers' compensation claim. (R. 943-44.) Dr. Semble wrote that as of the February 9, 2015, he remarked a "[n]ormal examination of the right knee" and diagnosed Lindo as having a lumbar strain with evidence of "lumbar disc protrusion at L5-S1." (R. 943.)

On April 14, 2015, Dr. Semble wrote an addendum report, explaining that he had been

---

[24] As discussed *infra*, although Lindo was receiving spine treatment from Dr. Olsewski (R. 805, 831, 832, 890, 930), his records are not part of the Administrative Record before this Court.

[25] The Administrative Record does not include Dr. Semble's February 9, 2015 findings, only his April 14, 2015 addendum report.

asked to opine on whether Lindo's condition had "attained maximum medical improvement and possible schedule loss of use of the right knee and right hip." (R. 943.) Dr. Semble found no schedule loss use in accordance with workers' compensation guidelines "attributable to the right knee and the right hip." (*Id*.) As to Lindo's spine, Dr. Semble was not able to determine whether she reached maximum medical improvement without more information from her treating physician. (*Id*.)

**P.**   **James R. McGee, D.C.**

On April 28, 2015, Dr. McGee, a board-certified chiropractic orthopedist, prepared a Doctor's Progress Report for the New York State Workers' compensation Board. (R. 591.) Lindo complained of low back pain and stiffness and reported that her condition continued to deteriorate, her functional and physical capabilities were limited, and that the pain radiated into her left leg. (R. 593-94.) On examination, palpation revealed paravertebral[26] myospasm of the lumbar spine and Dr. McGee noted a limited range of motion in the thoracolumbar spine, slight weakness in the right leg extensors, and hypoesthesia[27] along the right L4 and L5. (R. 593.) Straight leg raise testing was positive bilaterally. (*Id*.) Dr. McGee assessed lumbosacral sprain/strain, left foraminal herniation/protrusion at L5-S1, moderate left foraminal stenosis, a bulging disc, mild central and right foraminal stenosis, and mild facet arthrosis[28] and radiculopathy. (*Id*.) Dr. McGee checked boxes endorsing a 100% temporary impairment and that

---

[26] Paravertebral is defined as "beside the vertebral column." *See* Dorland's at 1382.

[27] Hypoesthesia is a "dysesthesia consisting of abnormally decreased sensitivity." Dorland's at 901. Dysesthesia is a "distortion of any sense, especially that of touch." *Id.* at 577.

[28] "Facet arthrosis is a degenerative condition in which joint cartilage in the vertebrae deteriorates and can cause the bones of the vertebrae to grind against each other resulting in pain and loss of mobility." *Monroe v. Berryhill*, No. 17 Civ. 3373, 2018 U.S. Dist. LEXIS 124675, at *15 n.31 (S.D.N.Y. Jul. 24, 2018) (citation omitted).

Lindo could not return to work for an unknown period of time. (R. 592.)

On June 10, 2015, Dr. McGee completed a second Workers' Compensation form and assessed similar examination findings as he did in April 2015, but additionally noted normal reflexes and "increasing back pain when sitting and standing for long periods," bending, and lifting. (R. 597.) Lindo presented "with flare ups of her condition" which Dr. McGee described as "chronic" and "permanent." (*Id*.) Dr. McGee reiterated the same diagnostic assessment, and reiterated his opinion of a 100% temporary impairment and that Lindo could not return to work for an unknown period of time. (R. 596-97.)

On June 23, 2015, Dr. McGee prepared a Report of Permanent Impairment for the Workers Compensation Board, based upon his examination of Lindo on June 10, 2015. (R. 599-602.) He opined that Lindo could occasionally[29] lift, carry, push and pull up to 10 pounds; occasionally sit, stand, kneel, bend, stoop, squat and drive a vehicle; and never climb, operate machinery or work around temperature extremes or high humidity. (R. 601.) Dr. McGee also assessed that Lindo frequently[30] could engage in simple grasping, fine manipulation and reaching in all directions. (*Id*.) As to the "applicable category of [Lindo's] exertional ability," Dr. McGee opined that Lindo can perform "less than sedentary work." (*Id*.)

Q.    **Howard V. Katz, M.D., FACS, FAAOS July 20, 2015 Orthopedic Examination**

On July 20, 2015, Lindo attended an orthopedic consultative examination with Dr. Katz, Board-Certified Orthopedic Surgeon, in connection with Lindo's workers' compensation claim. (R. 927-33.) Lindo told Dr. Katz that she could walk for a half mile, stand for two hours before

---

[29] The form defines "occasionally" as follows: "can perform activity up to 1/3 of the time." (R. 601.)

[30] The form defines "frequently" as follows: "can perform activity from 1/3 to 2/3 of the time." (*Id*.)

15

needing to sit and sit for two hours before needing to change positions. (R. 929, 936.) Lindo also reported that she could drive. (R. 929.) Dr. Katz observed that Lindo sat comfortably and moved her body freely upon examination, was able to get on and off the examination table without assistance and could dress and undress without assistance. (R. 930.)

Dr. Katz found no muscle spasm nor tenderness upon palpation of the paralumbar muscles. (R. 930.) Lindo had a reduced range of motion in her lumbar spine, and noted pain with range of motion testing, but straight leg raise testing was negative. (*Id*.) The doctor noted reduced flexion of the right knee and full range of motion of the bilateral hips. (R. 931.) She had swelling in the right knee. (*Id*.) Dr. Katz assessed a lumbar spine strain/sprain, resolved with residuals, a right hip sprain/strain, resolving, and a resolving right knee sprain/strain. (*Id*.) He assessed "a mild partial disability," and opined that Lindo was "capable of performing light duties with restrictions of no prolonged walking, standing, kneeling, squatting, and heavy lifting over 15 lbs." (*Id*.)

In reaching his conclusion, Dr. Katz relied upon various forms and doctors' notes including:

- "C-4 form dated 04/09/2015, by Dr. James McGee,[31]" (R. 929);

- an "[i]nitial consultation report dated 04/30/2015, by John M. Olsewski, M.D.,[32]" (R. 930);

- an "EC-4NARR form dated 05/19/2015, by Dr. John Olsewski," (*id*.);

- an "MRI report of the lumbar spine, by Michele Greco, M.D., dated

---

[31] This form is not part of the Administrative Record.

[32] Although various records refer to forms and records by Dr. John M. Olsewski, an orthopedic surgeon associated with Montefiore Hospital, his records are not part of the Administrative Record. (*See, e.g.*, R. 805, 831, 832, 890.)

05/18/2015[33]" showing "multilevel degenerative changes" with "no intrinsic spinal cord abnormality," (*id*.);

- a "[f]ollow-up visit report dated 06/04/2015, by John M. Olsewski, M.D." (*id*.); and

- a "C-4 AUTH form dated 06/05/2015, by John M. Olsewski, M.D." (*Id*.)

Dr. Katz addressed his report to Plaintiff's "treating physician[s]": Dr. McGee and Dr. Olsewski. (R. 926, 927.)

On the same date, Lindo self-completed a form indicating that she could walk half a mile in distance, she could stand for 2 hours before sitting, and she could sit 2 hours before changing positions. (R. 936.) Lindo also claimed that as of that date, she was "worse" compared to the initial injury. (R. 937.)

### R.    Wilson Orthopedics – 2015 Records

On June 5, 2015, Lindo returned to Dr. Wilson for the first time since 2013. (R. 891.) Lindo reported that, although her knee had been stable since 2013, she experienced intermittent pain. (*Id*.) Lindo described an episode on or around May 23, 2015 where she "woke up with significant pain and swelling in the knee." (*Id*.) There was mild swelling on examination. (*Id*.) Quadriceps strength was diminished compared to the left. (*Id*.) Dr. Wilson administered a cortisone injection of Depo-Medrol and Lidocaine[34] and referred Lindo to physical therapy. (*Id*.)

On July 1, 2015, Dr. Wilson performed a "reevaluation of [Lindo's] right knee" which she reported was causing "significant pain and swelling." (R. 831.) Lindo also reported continued "severe problems with her lower back," which was being "closely followed by Dr. Olsewski" and

---

[33] Lindo's May 18, 2015 MRI report by Dr. Greco also was not part of the Administrative Record.

[34] "Lidocaine is a local anesthetic (numbing medication). It works by blocking nerve signals in your body." *Drugs.com*, (last visited Sep. 22, 2019) https://www.drugs.com/search.php?searchterm=lidocaine&a=1

had "apparently been recently indicated for surgery" by Dr. Olsewski which had yet to be scheduled. (*Id*.) Dr. Wilson stated that she remains "totally disabled" and continued receiving therapy in her knees and back. (*Id*.) Lindo had diffuse tenderness and a large effusion in the right knee, and she especially was tender about the patellofemoral joint. (*Id*.) Range of motion was restricted by ten degrees. (*Id*.) Dr. Wilson aspirated the right knee and administered a Depo-Medrol with Xylocaine[35] injection. (*Id*.) He advised Lindo to continue therapy and anti-inflammatories. (*Id*.)

Lindo returned to Dr. Wilson on September 15, 2015, reporting that she had been seen by Drs. Olsewski and Adin, and that surgery of the lumbosacral spine had still not been scheduled. (R. 832.) Dr. Wilson noted she still had mild effusion with diffuse soft tissue swelling and tenderness. (*Id*.) Flexion was limited to 90 degrees. (*Id*.) Range of motion was associated with crepitus.[36] (*Id*.) Dr. Wilson issued Lindo a prescription for an additional MRI of her right knee and was instructed to continue conferring with Drs. Olsewski and Adin as to lumbosacral spine treatment. (*Id*.)

Dr. Wilson examined Lindo on October 27, 2015 following an October 5, 2015 MRI of her right knee at Total Radiology at Bainbridge Ave. MRI. (R. 833.) Dr. Wilson noted that the MRI revealed a medial meniscus tear at the posterior horn, grade 1 medial and collateral ligament sprain, and full thickness tear of the anterior cruciate ligament ("ACL"). (*Id*.) On examination, Lindo showed diffuse tenderness about the medial joint line and positive anterior drawer testing.

---

[35] Lidocaine is marketed under the brand name Xylocaine. *See Williams v. Stryker Corp.*, No. 09-CV-03971, 2010 U.S. Dist. LEXIS 59438, at *5 (D.N.J. 2010).

[36] Crepitus, or crepitation, is "the noise made by rubbing together the ends of a fractured bone." Dorland's at 429.

(*Id*.) Dr. Wilson noted Lindo would benefit from arthroscopy, partial meniscectomy[37] and ACL reconstruction. (*Id*.) Dr. Wilson recommended arthroscopic ACL reconstruction and partial meniscectomy later that month. (*Id*.)

### S.     Allen Meisel, M.D. December 8, 2015 Consultative Orthopedic Examination

On December 8, 2015, Lindo attended an orthopedic consultative examination with Dr. Meisel at the Commissioner's referral. (R. 835-47.) Lindo's chief complaints were hypothyroidism, lumbar back pain, hypertension, asthma and gastroesophageal reflux disease (GERD).[38] (R. 835.) Lindo reported injuring her back after slipping on snow at her job, receiving six-to-eight epidural injections without relief over the subsequent months, and being diagnosed with bulging discs, for which surgery was approved. (R. 835.) She complained of lumbar pain that was eight out of ten without medication and six out of ten with medication. (*Id*.) She complained of right knee pain at a six out of ten without medication and two of ten with medication. (*Id*.)

Lindo explained that her daily activities included cooking, cleaning, laundry, shopping, showering and dressing herself, sometimes requiring assistance to put on her shoes. (R. 836.) Dr. Meisel observed that Lindo did not use a cane at the examination, as she left it in the car, and walked with a normal gait. (R. 835-36.) She reported the ability to walk one block with medication. (R. 835.) She was unable to squat but needed no help changing for the examination or getting on and off the examination table, and was also able to rise from a chair without

---

[37] A "meniscectomy" is the "excision of an intra-articular meniscus, as in the knee joint." Dorland's at 1134. The "meniscus" refers to semilunar or "crescent-shaped" cartilage in the knee. Dorland's at 1134-35.

[38] "Gastroesophageal reflux disease," commonly called GERD, is "any condition noted clinically or histopathologically that results from gastroesophageal reflux, ranging in seriousness from mild to life-threatening; principal characteristics are heartburn and regurgitation." Dorland's at 533.

difficulty, she could walk on her heels and toes without difficulty, and stood normally. (R. 836-37.)

Dr. Meisel's examination of Lindo's cervical spine and upper extremities was unremarkable. (R. 837.) Lindo had reduced flexion and rotary movement of her thoracic and lumbar spinal regions. (*Id*.) Straight leg raise testing was negative bilaterally. (*Id*.) Range of motion in the lumbar spine was limited to 30 degrees of flexion, 10 degrees of lateral flexion bilaterally, 0 degrees of right rotation and 20 degrees of left rotation. (*Id*.) Dr. Meisel's examination of Lindo's lower extremities revealed full range of motion of the hips, ankles and left knee; 90 degree range of motion of the right knee; and full strength except for reduced strength in the right proximal muscles. (*Id*.) Dr. Meisel noted tenderness of the medial meniscal area of the right knee, which was swollen and tender, but assessed no sensory or joint abnormalities. (*Id*.)

Dr. Meisel assessed "lumbar back pain, probably related to herniated disc disease," osteoarthritis of the right knee, hypothyroidism, GERD, hypertension and asthma. (R. 837-38.) The doctor opined that Lindo "has moderate limitations of standing, walking, climbing stairs, bending, and kneeling[,]" and that she should avoid exposure to smoke, dust and other respiratory inhalants due to her asthma. (R. 838.)

On the same day as her examination, Dr. Meisel prepared a Medical Source Statement of Ability to Do Work-Related Activities (Physical) form. (841-47.) Dr. Meisel checked boxes indicating that Lindo could frequently lift and carry up to 10 pounds, sit for 30 minutes, stand for 20 minutes, and walk for 20 minutes, both at one time and total in an eight-hour day, and required a cane to ambulate. (R. 841-42.) The doctor indicated that Lindo could occasionally reach, handle, finger, feel, push, pull, and operate foot controls, but could never climb, balance,

stoop, kneel, crouch, or crawl, work around unprotected heights or moving mechanical parts, or operate a motor vehicle. (R. 843-85.) She could occasionally work around humidity, wetness, dust, odors, fumes, pulmonary irritants, extreme cold, extreme heat, and vibrations, and could tolerate office level noise. (R. 845.) The doctor checked boxes indicating that Lindo could not perform activities like shopping or travel without a companion, but could ambulate without using a wheelchair, walker, or two canes or crutches. (R. 846.) Dr. Meisel also assessed that Lindo was able to walk a block at a reasonable pace on rough or uneven surfaces; use standard public transportation; climb a few steps at a reasonable pace with the use of a single hand rail; prepare a simple meal and feed herself; care for her personal hygiene; and sort, handle and use papers/files. (*Id*.)

On December 10, 2015, Lindo had X-rays taken of her lumbosacral spine and right hip. (R. 839-40.) The x-rays of Lindo's spine revealed degenerative changes, and x-rays of her right hip revealed no significant bony abnormality. (*Id*.)

### T.    Empire State Ambulatory Surgery Center – January 18, 2016 Knee Surgery

On January 18, 2016, Lindo underwent arthroscopic surgery on her right knee to correct partial medial and lateral meniscal tears as well as a partial tear of the ACL, and symptomatic plica.[39] (R. 888.) Dr. Wilson performed the surgery and reported the surgery to be successful. (R. 888-89.)

### U.    Edmund Ganal, M.D. February 1, 2016 Orthopedic Examination

On February 1, 2016, Dr. Ganal, Board-Certified Orthopedic Surgeon, performed an independent orthopedic examination of Lindo in connection with her workers' compensation

---

[39] "Plica" is a general term for a ridge or a fold. *See* Dorland's at 1467.

claim. (R. 916-22.) She complained of pain rated 5 of 10 in the middle and lower back and right knee, and claimed that her pain was aggravated by reaching overhead, bending, and prolonged sitting. (R. 917.) Lindo also reported that she could walk one city block without experiencing too much pain, and had difficulty climbing stairs. (*Id*.) Dr. Ganal noted that Lindo walked with a mild limp, used crutches and had a mildly antalgic gait[40] to the right leg. (*Id*.) Upon examination, there was no paraspinal spasm but Lindo exhibited minimal paraspinal tenderness upon palpation and muscle strength in the right knee was diminished. (R. 917-18.) She was unable to rise on heels or toes and range of motion in the lumbar spine was limited to 20 degrees of flexion, 0 degrees of extension and 5 degrees of lateral bending. (R. 918.) Lindo was tender to palpation of the right knee with mild effusion and flexion to 75 degrees. (*Id*.) Dr. Ganal suggested further physical therapy for the spine and right knee. (R. 919.)

The doctor assessed thoracic spine strain, lumbar spine strain, right hip sprain and status post right knee arthroscopic surgery. (R. 918.) Dr. Ganal opined that Lindo had a "marked disability from an orthopedic standpoint," but that she was capable of returning to work as long as she did not lift objects weighing greater than 5 pounds, engage in prolonged standing or walking, "excessive stair climbing," work around vertical ladders, and she avoided squatting and repetitive bending. (R. 919.)

In a self-completed form dated the same day, Lindo indicated that she was taking Naproxen for pain, which helped "a little;" the medication permitted her to sit for 3 hours, whereas she could only sit for 1 1/2 hours without. (R. 925.) Lindo also indicated that her pain

---

[40] "An antalgic gait is one in which the stance phase of walking is shortened on one side due to pain on weight bearing." *Rodriguez v. Astrue*, No. 02-CV-01488, 2009 WL 1619637, at *6 n.23 (S.D.N.Y. May 15, 2009) (internal citation omitted).

was increased by reaching overhead, bending and prolonged sitting. (*Id*.)

**V.     Allen Meisel, M.D. March 22, 2016 Revised Consultative Medical Source Statement**

On March 22, 2016, Dr. Meisel submitted an addendum to his earlier report and revised medical source statement form. (R. 954-61.) The cover letter did not indicate a reason the form was being revised, however, it confirms that Dr. Meisel's examination of Lindo took place on December 8, 2015. (*See* R. 954.) In his revised opinion, Dr. Meisel assessed that Lindo could lift and carry up to 20 pounds occasionally and 10 pounds continuously, sit for up to three hours, at one time and total in an eight-hour workday, and stand and walk for up to one-hour each, at one time and total in an eight-hour workday. (R. 955-56.) Dr. Meisel found that Lindo did not need a cane to ambulate. (R. 956.)

Dr. Meisel further concluded that Lindo frequently could reach, handle, finger, feel, push, pull, and operate foot controls, and could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, but could never climb ladders or scaffolds. (R. 957-58.) She occasionally could be exposed to unprotected heights, moving mechanical parts, and operate a motor vehicle. (R. 959.) Lindo frequently could work around humidity, wetness, dust, odors, fumes, pulmonary irritants, extreme cold, extreme heat and vibrations; and could tolerate office level noise. (*Id*.) Finally, Dr. Meisel opined that Lindo could perform activities like shopping; traveling without a companion for assistance; ambulating without using a wheelchair, walker, or two canes or crutches; walking a block at a reasonable pace on rough or uneven surfaces; using standard public transportation; climbing a few steps at a reasonable pace with the use of a single hand rail; preparing a simple meal and feed herself; caring for her personal hygiene; and sorting, handling and using papers/files. (R. 960.)

**W.    Allen Meisel, M.D. March 24, 2016 Revised Medical Source Statement**

Two days later, on March 24, 2016, Dr. Meisel revised his medical source statement a second time, changing only his assessment concerning sitting, standing and walking. (R. 962-68.) Dr. Meisel again made no indication as to why he revised the form. Dr. Meisel's second revised opinion stated that Lindo could sit for up to three hours at one time, and stand and walk for up to one hour each at one time. (R. 963.) The doctor also revised his finding to state that Lindo could sit a total of six hours in an eight-hour workday, and stand and walk for three hours each in an eight-hour workday. (*Id*.)

**X.    Lincoln Medical and Mental Health Center**

Lindo also submitted several years' worth of records from Lincoln Medical and Mental Health Center, which appears to be where her primary care physicians worked. (R. 361-474.) These records largely reflect treatment unrelated to Lindo's benefits application. However, the records show Lindo's histories of essential hypertension and Asthma.[41] (R. 363, 374, 376, 399, 423, 438, 450, 460, 552.) The records also reflect references to Lindo's December 29, 2012 fall and the pain and injuries she experienced as a result. During a visit on September 24, 2013, Lindo "reported that she had a fall on December 29, 2012" and that "she fell on her hips." (R. 380.) Subsequently, on October 24, 2013, Lindo complained "of worsening numbness in both extremities, right worse than left." (R. 376.)

---

[41] Other documents in the Administrative Record also noted Lindo's hypertension and asthma. (*See* R. 328 (Montefiore Emergency Department noting asthma); R. 344 (Dr. J.O. Walters noting asthma); R. 835-36 (Dr. Meisel noting asthma and hypertension); R. 916 (Dr. Ganal noting asthma and hypertension).)

IV.     **Administrative Hearings**

    A.      **The November 3, 2015 Administrative Hearing**

    At the administrative hearing on November 3, 2015, Lindo testified that she was a licensed home health and personal care aid, but that she had not worked since she fell down stairs in the snow outside of a patient's home on December 29, 2012. (R. 49, 63-65.) She testified that she was descending the stairs when suddenly she found herself on the ground "with the right foot bent under the left." (R. 64.) When asked whether she would be capable of sitting long enough to perform sedentary work, Lindo testified that the pain in her back was too intense; even after receiving epidural injections, she experienced pain in her back that radiates to her legs and hips such that she had "to just stay still." (R. 65, 66-67.) Lindo also testified that she received the last injection shortly before the hearing, but that Dr. Adin discontinued injections because the shots were not helping. (R. 66.)

    Lindo testified that she had seven children, as of that time, between the ages of 24 and 3. (R. 53.) Since Lindo's fall on December 29, 2012, she had been taking care of two her youngest children with help from her husband, her 24-year-old daughter, the children's paternal grandmother, a friend of Lindo's located in Jamaica who took Lindo's youngest child for six months in 2015, and Lindo's mother in Maryland who took Lindo's second youngest child for two months. (R. 54-56.) As far as the household chores, her husband did most of the laundry and cleaning when he was home from work, but Lindo helped with laundry, washed the dishes and did some light cooking, with help from her oldest daughter. (R. 60-62.) Lindo had been collecting $140 per week in workers' compensation. (R. 62.)

    Shortly after the hearing began, it became clear that the record was incomplete. (R. 51-

53, 67.) ALJ Feuer explained to Lindo's counsel that the record before him as of that date only included some workers' compensation forms, none of which indicated that Lindo was not capable of performing sedentary work. (R. 69.) If there were no records showing Lindo was incapable of performing sedentary work, ALJ Feuer remarked "[i]t would be difficult, at best, to find her disabled." (*Id*.) In order for ALJ Feuer to determine that Lindo was disabled, her counsel would have to show that she is "less than sedentary." (R. 70.)

**B.**     **The March 15, 2016 Administrative Hearing**

The administrative hearing continued on March 15, 2016, the record having been supplemented with exhibits 9F through 14F.[42] (R. 76-77.) Lindo appeared at the hearing using a cane in her right hand, purportedly because she was experiencing pain in her left hip radiating from her back. (R. 83.) Lindo began using the cane about a week earlier, after hurting herself picking up a box. (*Id*.)

Lindo testified that, on January 18, 2016, after her previous testimony, she had undergone arthroscopic surgery on her right knee. (R. 77-79.) Lindo stated that she began physical therapy two times a week in February 2016 and had been visiting the gym on her own volition between two and three times a week to utilize the recumbent bike for 15 to 20 minutes and the treadmill for 10 minutes. (R. 80-82.) Lindo drove or was driven to the gym, which took two minutes from her apartment. (R. 88.) Lindo testified that neither the surgery nor her time spent in the gym eliminated the pain in her back. (R. 86.) Lindo took Naproxen for pain, sometimes three times daily. (R. 86.) Lindo took it in the morning with breakfast and throughout the day as needed;

---

[42] Exhibits 15F and 16F were provided to ALJ Feuer after the second hearing was concluded. (R. 29.) Exhibit 16F included Dr. Meisel's revised medical source statements from March 22 and 24, 2016. *See* Background Sections III.V. and III.W., *supra*.

estimating that Naproxen alleviated pain about 40% of the time. (R. 89.) Lindo stated that her knee surgery had done nothing to improve her ability to do things in her household. (R. 87-88.)

Since the previous hearing, the Workers' Compensation Board had approved Lindo for surgery to fuse her back. (R. 84.) Lindo had planned to follow up with Dr. Olsewski[43] for clearance and scheduling, but Lindo stated that she was scared, and therefore unsure whether she wanted to go through with the surgery. (*Id*.)

Lindo still was collecting workers' compensation benefits, but she was not sure the amount of her weekly check as she had received a check for $759 shortly before the hearing and Lindo was not certain if the recent check was an adjustment for prior payments or the amount she could expect weekly. (R. 85.)

When asked whether she would be able to perform a job that required "sitting down most of the day," Lindo said that she could not. (R. 89.) In order to sit for long periods, Lindo would have to take Naproxen, which made her sleepy. (*Id*.) Lindo stated that her knee would start to bother her if she sat for two uninterrupted hours, but that the pain and stiffness in her back got triggered sooner, requiring her to stand and stretch. (R. 89-90.) When Lindo was at home, she spent her time lying down. (R. 90-91.)

Lindo testified that all seven of her children lived with her and her husband, and that she relied heavily upon her older children, aged 25, 20 and 15, to help take care of Lindo's three youngest children. (R. 92-93.) Lindo's youngest child often was cared for by his paternal grandmother, who lived a 10-minute drive from Lindo. (R. 95.)

---

[43] Although the transcript spelled the doctor's name phonetically as Dr. Asuski (*see* R. 50), records from Dr. Wilson indicate that Plaintiff was being treated by Dr. Olsewski in relation to back surgery. (R. 831, 832.) Thus, the spelling of the doctor's name as "Asuski" is a typographical error.

Vocational expert ("VE") Dr. Yaakov Taitz also testified at the hearing. (R. 96-100.) The VE was asked to assume an individual of Lindo's age, education and work history, who was capable of a full range of sedentary work, except who could not stand or walk for continuous periods exceeding 20 minutes, and who occasionally could climb ramps and stairs; and occasionally stoop, kneel and crawl. (R. 98-99.) The VE testified that such an individual could perform sedentary work as an addresser (U.S. Department of Labor's Dictionary of Occupational Titles ("DOT") Code 209.587-010; approximately 16,000 jobs nationally; sedentary SVP 2), document preparer (DOT Code 249.587-018; approximately 18,000 jobs nationally; sedentary SVP 2) or order clerk (DOT Code 209.567-014; approximately 75 jobs nationally; sedentary SVP 3). (R. 100.)

If the assumption were restricted such that the individual never would be able to kneel or crawl, the VE testified that his response would not change. (R. 100.) Lastly, the VE was asked to assume that, in addition to the aforementioned restrictions, the individual also frequently could lift, carry, push or pull up to five pounds, and occasionally lift, carry, push or pull five pounds, but could never reach overhead. (R. 100.) The VE responded "[t]here would be no more jobs."[44] (*Id*.) The VE further testified that Lindo would not be capable of performing her past work. (*Id*.)

## V.    ALJ Feuer's Decision And Appeals Council Review

Following the five-step process, *see infra* Legal Standards Section II, on October 3, 2016, ALJ Feuer determined that Lindo did not have a disability within the meaning of the Act. (R. 26-39.) The ALJ found at step one that Lindo had not engaged in substantial gainful activity during

---

[44] The Court reads this response to mean that the assumed individual would not be able to perform any jobs in the national economy with such restrictions, but the testimony is not clear on this point.

the period from her alleged onset date to the date last insured. (R. 31.) At step two, the ALJ determined that Lindo had the severe impairments of "a torn meniscus or internal derangement of the right knee and degenerative disc disease of the lumbar spine." (*Id.*)

At step three, the ALJ found that Lindo did not have an impairment or combination of impairments that met or equaled the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. (R. 32.) In making this decision, the ALJ considered Listings 1.02 for knee condition and 1.04 for disorders of the spine, but found that the record did not demonstrate "chronic joint pain and stiffness with signs of limitations of motion or other abnormal motion of the affected joints," or compromise of the nerve root with the requisite additional findings. (*Id.*)

The ALJ then assessed Lindo's Residual Functional Capacity ("RFC") and determined that she was able to perform sedentary work,[45] except the work could not require standing or walking for a continuous period of greater than twenty minutes. (R. 32-37.) Based on this RFC, the ALJ concluded at step four that Lindo could not perform her past relevant work as a home health aide. (R. 37.) At step five, ALJ Feuer determined that there were jobs available in the national economy that Lindo could perform, *i.e.*, that of an addresser, a document preparer or an order clerk. (R. 38.) Thus, the ALJ concluded that Lindo was not disabled. (R. 39.)

In construing Lindo's RFC, ALJ Feuer determined that, with respect to Lindo's claims of being unable to sit for longer than two hours at a time, "claimant's statements concerning the

---

[45] Sedentary work involves lifting and carrying no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. *See* 20 C.F.R. § 404.1567(a). Sedentary jobs relate to jobs requiring standing and walking for a total of 2 hours during an 8-hour workday, and sitting for 6 hours of an 8-hour workday. *Titles II & Xvi: Determining Capability to Do Other Work-Implications of A Residual Functional Capacity for Less Than A Full Range of Sedentary Work*, SSR 96-9P (S.S.A. July 2, 1996). "If an individual is unable to sit for a total of 6 hours in an 8-hour work day, the unskilled sedentary occupational base will be eroded." *Id.*

intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (R. 33.) ALJ Feuer cited to an indication that Lindo had "a strong role in caring for her seven children" and the fact that she drove for errands "despite her alleged sitting limitations." (*Id*.)

ALJ Feuer noted that the evidence supported that Lindo fell, had sustained a lumbar spine injury, experienced pain and radiating pain, limitations and a disruption of daily activities as a result, but noted that the Montefiore emergency department records, almost immediately after the fall, indicated a "minimal dysfunction." (R. 33-34.) Accordingly, and in light of Lindo's improvement with steroid injections, albeit with setbacks noted in the record, ALJ Feuer determined that the extent of Lindo's limitations were not as great as she indicated. (R. 34.) With respect to Lindo's right knee, ALJ Feuer relied on periodic reports of good flexion, signs of improvement and the surgery to find that Lindo's limitations would continue to improve. (*Id*.)

ALJ Feuer then described his reasoning for assigning partial or little weight to Lindo's treating physician notes (Dr. Wilson), and each orthopedic and consultative examination in the record. (R. 34-37.) ALJ Feuer accorded little weight to Dr. Wilson's treatment notes in that they "seem to be merely an endorsement of subjective complaints . . . prior to receipt of prescribed clinical tests" and determine disability on a differing legal standard, applicable in workers' compensation claims. (R. 35.) ALJ Feuer made no reference to Dr. Wilson's clinical findings after receipt of the clinical tests.

Little weight was accorded to Dr. Walsh's orthopedic examinations because ALJ Feuer found that Dr. Walsh did not clearly establish his measurement of dysfunction or limitations. (R. 35.) The postural limitations referenced in Dr. Walsh's reports were accorded no weight

because, according to ALJ Feuer, the findings were not consistent with the record. (*Id*.) As to Dr. S.M. Walters' January 6, 2015 IM Consult Report, ALJ Feuer found that only little weight should be accorded because Dr. S.M. Walters' finding of disability usurped the Commissioner's role, and his findings that Lindo had residual range of motion contradict his finding that she could not be gainfully employed. (*Id*.)

Dr. Semble's April 14, 2015 orthopedic report addendum similarly was accorded little weight "for the same reasons related to Dr. [S.M.] Walters' opinion." (R. 35.) In addition, ALJ Feuer found Dr. Semble's "opinion [did] not specify functional limits." (*Id*.) ALJ Feuer did not address the fact that the record omitted Dr. Semble's initial orthopedic report. (*Id*.)

ALJ Feuer assigned partial weight to portions of the two progress reports and the one report of impairment prepared by Dr. McGee, to the extent only that they identified limitations that were consistent with the record. (R. 36.) ALJ Feuer accorded no weight to the opinions of Dr. McGee, as far as the degree of Lindo's limitations, finding them inconsistent with the record. (*Id*.) According to ALJ Feuer, inconsistencies in Dr. McGee's opinions included his "unfounded and unsubstantiated" findings as to Lindo's environmental limitations. (*Id*.) ALJ Feuer did not address his reasoning for assigning no weight to Dr. McGee's determination that Lindo was incapable of sitting for longer than two hours. (*Id*.) Similarly, ALJ Feuer accorded no weight to the portions of Dr. Katz's July 2015 and Dr. Ganal's February 2016[46] orthopedic examinations he found to be inconsistent with the record; specifically, those portions determining Lindo's limitations to be lower than ALJ Feuer's RFC determination, and only partial weight to the portions that he deemed to be consistent. (*Id*.)

---

[46] ALJ Feuer's decision erroneously states that Dr. Ganal's examination occurred on September 20, 2016.

Lastly, ALJ Feuer considered the consultative orthopedic examination opinions of Dr. Meisel, one dated December 8, 2015 after he examined Lindo, and two subsequent addendum reports dated March 22, 2016 and March 24, 2016. (R. 36-37.) Portions of the December 2015 medical source statement that did not show a "high extent in limitations" was accorded little weight because it was deemed inconsistent with the record. (R. 36.) For example, ALJ Feuer disagreed with Dr. Meisel's reliance on Lindo's asthma for environmental limitations, since there was no record that Lindo had been treated for asthma since her disability onset date. (*Id*.) ALJ Feuer then addressed the differences in opinion as stated by Dr. Meisel in December 2015, on March 22, 2016 and March 24, 2016, concluding "[t]he variation between the three medical source statements may indicate a lack of facility with the forms." (R. 37.) Accordingly, ALJ Feuer accorded partial weight to portions of both March 2016 opinions but found Dr. Meisel's latest opinion – showing capacity for sedentary work – the most consistent with the record. (*Id*.)

Following the ALJ's October 3, 2016 decision, Lindo sought review from the Appeals Council and submitted additional evidence for the Appeals Council's review, most of which postdated ALJ Feuer's decision. (R. 2, 8-25.) On December 5, 2017, the Appeals Council denied Lindo's request for review. (R. 1-7.) The Appeals Council explained that it found no reason to review the ALJ's decision. (R. 1.) As to the additional evidence, the Appeals Council indicated that 42 pages of the records submitted previously were submitted and considered by the ALJ. (R. 2.) The Appeals Council declined to review the additional medical records, dated from December 6, 2016 to April 29, 2017,[47] since they did not "affect the decision about whether [Lindo was]

---

[47] The records submitted for Appeals Council consideration include an independent orthopedic examination of Lindo dated December 6, 2016 performed by Dr. Galano (R. 9-15) finding lumbar spine strain, right hip strain and right knee strain status post arthroscopic surgery. (R. 14.) Dr. Galano found that

disabled beginning on or before October 3, 2016, the date of ALJ Feuer's opinion. (R. 2.)

**LEGAL STANDARDS**

I.   **Standard Of Review**

In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does [the Court] determine whether the Commissioner's conclusions were supported by substantial evidence." *Ulloa v. Colvin*, No. 13-CV-04518, 2015 WL 110079, at *6 (S.D.N.Y. Jan. 7, 2015) (citing *Tejeda v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999)). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision[.]" *Id.*; *accord Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

Absent legal error, the ALJ's disability determination only may be set aside if it is not supported by substantial evidence. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (vacating and remanding ALJ's decision). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "The substantial evidence standard is a very deferential standard of review—even

---

Lindo could work as long as she avoided lifting greater than 20 pounds and did not require squatting or repetitive bending. (R. 14.) On December 7, 2016, Dr. Galano prepared a Report of Permanent Impairment for the Workers' Compensation Board finding that Lindo frequently could sit, stand, walk and climb. (R. 18.) Plaintiff also submitted records from a follow up visit with Dr. Wilson, on January 9, 2017 finding limited range of motion in her right knee, and noting that Plaintiff had declined back surgery. (R. 8.) On April 29, 2017 Dr. Wilson completed a "Doctor's Report of MMI / Permanent Impairment" (R. 23-25) opining that plaintiff was capable of performing "Light Work" or "[p]hysical demand requirements . . . in excess of those for Sedentary Work," requiring "sitting most of the time." (R. 25.)

more so than the clearly erroneous standard, and the Commissioner's findings of fact must be upheld unless a reasonable factfinder *would have to conclude otherwise*." *Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019), *as amended* (Apr. 30, 2019) (summary order) (quoting *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (emphasis in original) (internal quotation marks omitted). While it is not necessary for an ALJ to "reconcile explicitly every conflicting shred of medical testimony," the ALJ cannot issue "an unreasoned rejection of all the medical evidence in a claimant's favor." *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983); *see also Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010). If the findings of the Commissioner as to any fact are supported by substantial evidence, those findings are conclusive. *Diaz v. Shalala*, 59 F.3d 307, 312 (2d Cir. 1995).

## II.      Determination Of Disability

Under the Act, every individual determined to have a "disability" is entitled to disability insurance benefits. 42 U.S.C. § 423(a)(1). The Act defines "disability" as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

> [A]n individual shall be determined to be under a disability only if [the combined effects of] his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

In determining whether an individual is disabled, the Commissioner must consider:

"(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).

The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims:

I.      At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. . . .

II.     At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509 [continuous period of 12 months], or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. . . .

III.    At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled. . . .

IV.     At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. . . .

V.      At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520.

If it is determined that the claimant is or is not disabled at any step of the evaluation process, the evaluation will not progress to the next step. 20 C.F.R. § 404.1520(a)(4). After the first three steps (assuming that the claimant's impairments do not meet or medically equal any Listing), the Commissioner is required to assess the claimant's RFC "based on all the relevant

medical and other evidence in [the claimant's] case record." 20 C.F.R. § 404.1520(e). A claimant's

RFC is "the most [the claimant] can still do despite [the claimant's] limitations." 20 C.F.R. §

405.1545(a)(1).

The claimant bears the burden of proof as to the first four steps. *Melville v. Apfel*, 198

F.3d 45, 51 (2d Cir. 1999). It is only after the claimant proves that she cannot return to work that

the burden shifts to the Commissioner to show, at step five, that other work exists in the national

and local economies that the claimant can perform, given the claimant's RFC, age, education and

past relevant work experience. *Id.* at 51.

## III.   The ALJ's Duty To Develop The Record

When the ALJ assesses a claimant's alleged disability, the ALJ must develop the claimant's

medical history for at least a 12-month period. 42 U.S.C. § 423(d)(5)(b), 20 C.F.R. § 404.1512(d).

Because social security proceedings are "essentially non-adversarial," the ALJ has an affirmative

duty to develop the record. *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508-09 (2d Cir. 2009)

(internal citation omitted). The duty to develop the record is "even more important when the

information concerns a claimant's treating source." *See Ulloa*, 2015 WL 110079, at *11 (citation

omitted). This is because treating sources "are likely to be the medical professionals most able

to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring

a unique perspective to the medical evidence that cannot be obtained from the objective medical

findings alone or from reports of individual examinations." *Marinez v. Comm'r of Soc. Sec.*, 269

F. Supp. 3d 207, 216 (S.D.N.Y. 2017) (citing 20 C.F.R. § 416.927(c)(2)). The ALJ's duty to develop

the record is "inextricably linked" to the treating physician rule, which requires controlling weight

be given to the opinion of a claimant's treating physician when it is supported by accepted

diagnostic techniques and not inconsistent with other evidence in the record. *Lacava v. Astrue*, No. 11-CV-07727, 2012 WL 6621731, at **12-13 (S.D.N.Y. Nov. 27, 2012), *report and recommendation adopted*, 2012 WL 6621722 (S.D.N.Y. Dec. 19, 2012).

"Even when a claimant is represented by counsel, it is the well-established rule in our circuit that the social security ALJ, unlike a judge in a trial, must on behalf of all claimants affirmatively develop the record." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (internal citations and quotations omitted.) "Whether the ALJ has met this duty to develop the record is a threshold question." *Castillo v. Comm'r, Soc. Sec. Admin.*, No. 17-CV-09953, 2019 WL 642765, at *6 (S.D.N.Y. Feb. 15, 2019). In other words, "before reviewing the ALJ's disability determination under the substantial evidence standard, the court must first be satisfied that the ALJ . . . fully and completely developed the administrative record." *Scott v. Astrue*, No. 09-CV-03999, 2010 WL 2736879, at *12 (E.D.N.Y. July 9, 2010). Upon a finding that the ALJ did not discharge this duty, remand is appropriate. *Moran v. Astrue*, 569 F.3d 108, 114-15 (2d Cir. 2009) (remanding "because the ALJ should have developed a more comprehensive record before making his decision.").

## DISCUSSION

The central issue in the cross-motions before the Court concerns whether Plaintiff is capable of performing sedentary work. (*See* Pl. Mem. at 13-17; Def. Mem. at 19-25; Pl. Reply at 1-3.) The ALJ ruled that Plaintiff had the RFC "to perform sedentary work," "except the work cannot require standing or walking for a continuous period greater than twenty minutes." (R. 32.)

SSA regulations state that, "a sedentary job is defined as one which involves sitting." 20 C.F.R. §§ 404.1567(a). As the Second Circuit has recognized, "the concept of sedentary work contemplates substantial sitting." *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984) (citing

*Carroll v. Sec'y of Health and Human Servs.*, 705 F.2d 638, 643 (2d Cir. 1983)); *see also* SSR 96-9P, 1996 WL 374185, at *3 (in a full range of sedentary work, "[s]itting would generally total about 6 hours of an 8-hour workday"). Thus, "[t]he ability to sit for prolonged periods is an essential inquiry in determining whether a claimant has the residual functional capacity to perform sedentary work." *Koseck v. Sec'y of Health and Human Servs.*, 865 F. Supp. 1000, 1013 (W.D.N.Y. 1994) (citing *Ferraris*, 728 F.2d at 586-87).

If Plaintiff were incapable of sitting for six hours in a day, as required by sedentary work, she would be found disabled, as the ALJ recognized at the first hearing:

> [S]ince she's under 50 years of age, if she could perform sedentary work, I would not have a basis of finding her disabled . . . . I have to decide she's less than sedentary. If she's sedentary, she's not disabled. . . . I don't want to run a hearing where I don't have the evidence in which to look at this case in the light it might need to in order to evaluate. I want to decide this case when she comes back before me with all the evidence that explains, from the perspective of the Social Security Act, that this individual, at no time, or at some point after the injury, moved from a status, moved to a status of less than sedentary, and therefore is required -- I'm required to give her disability benefits.

(R. 69-70.)

There are two independent grounds that require remand in this case. First, the ALJ failed to develop the record. Second, substantial evidence does not support the ALJ's finding that Plaintiff can sit for long enough to perform sedentary work. This Opinion first addresses the Administrative Record regarding Plaintiff's sitting limitations and the ALJ's consideration thereof. Then, this Opinion addresses the two independent grounds requiring remand.

**I.**     **Administrative Record Regarding Sitting Limitations and ALJ Feuer's Consideration Thereof**

The Administrative Record contains various medical sources which address Plaintiff's sitting limitations: one 2013 opinion (of four) by Dr. Walsh, finding Plaintiff capable of sedentary

work (R. 357); 2015 physical therapy notes from Dr. S.R. Walters indicating Plaintiff's inability to sit and referring her to a spinal surgeon (R. 805); 2015 opinions from Dr. McGee, Lindo's treating chiropractor,[48] finding that she could "occasionally" sit and could perform "less than sedentary work" (R. 597, 601); and three different consultative statements from Dr. Meisel, respectively, finding that Lindo was capable of sitting for 30 minutes, three hours and six hours in an eight-hour period. (R. 842, 956, 963.)

With respect to Dr. Walsh, the ALJ accorded little to partial weight to three of Dr. Walsh's four opinions to the extent that the findings "inform[] the residual functional capacity," and made specific mention of Dr. Walsh's October 2013 finding that Plaintiff could perform sedentary work. (R. 35.) He did not credit Dr. Walsh's fourth opinion from July 2014, indicating that Plaintiff's spinal strain had resurfaced. (*Id*.) Significantly, ALJ Feuer failed to acknowledge that Dr. S.R. Walters' March 2015 physical therapy notes referred Plaintiff to Dr. Olsewski, spinal surgeon, and indicating a "severe exacerbation" of Plaintiff's back pain, and an inability to sit. (*See* R. 32-37, 805.)

In June 2015, Dr. McGee found that Plaintiff could perform "less than sedentary work." (R. 601.) ALJ Feuer found that Dr. McGee's opinion denotes "limitations far exceeding those substantiated by the clinical evidence" and assigned "only partial weight to the extent that it identifies some limitations consistent with the record, but not to the extent that it specifies the degree of limitations." (R. 36.)

---

[48] The Court recognizes that the SSA regulations do not consider a chiropractor's opinion as a medical source statement, 20 C.F.R. § 404.1527(a)(2), and thus that a treating chiropractor will not fall under the treating physician rule. *Diaz*, 59 F.3d at 313. Nonetheless, "the ALJ must afford some weight to a treating chiropractor's assessment." *Losquadro v. Astrue*, No. 11-CV-01798, 2012 WL 4342069, at *15 (E.D.N.Y. Sept. 21, 2012).

As to Dr. Meisel's three consultative opinions, the ALJ accorded little weight to the first opinion, dated December 8, 2015, which found that Plaintiff could sit for 30 minutes, but only insofar as it "correctly identifies some limitations." (R. 36.) The ALJ deemed it inconsistent with the record of Plaintiff's limitations. (*Id*.) As to the two revised statements submitted more than three months after Dr. Meisel examined Plaintiff, ALJ Feuer found the March 24, 2016 opinion opining that Plaintiff was capable of sitting for six hours in an eight-hour period was the most "consistent opinion with the record evidence" and with his own RFC. (R. 37.) Accordingly, the portions of these reports making determinations purportedly consistent with the record evidence were accorded partial weight by the ALJ. (*Id*.) ALJ Feuer explained the variations among the three opinions as Dr. Meisel's suspected "lack of facility with the forms." (R. 36-37 ("The variation between the three medical source statements may indicate a lack of facility with the forms.").)

## II.     The ALJ Failed To Develop The Record

While the Administrative Record is voluminous and contains several opinions, tests and evaluations from a dozen doctors, the record is missing records from her treating physician, Dr. John M. Olsewski of Montefiore Hospital. *See* footnote 32, *supra*. ALJ Feuer was on notice that a Dr. Olsewski from Montefiore was treating Plaintiff's back.[49] Indeed, during Plaintiff's first

---

[49] From Plaintiff's hearing testimony, it appears that there may have been a second doctor with the same name at Lincoln Medical and Mental Health Center. (R. 50, 84.) While being questioned about her back pain and her possible back surgery, Plaintiff testified:

> [CLMT]: I, that's, I was referred to Dr. Asuski [Olsewski], that's who, that's the surgeon.
> . . .
> ATTY: He's at Lincoln.
> CLMT: Oh, no, Dr. Asuski [Olsewski], that's my primary care doctor. James Asuski [John Olsewski] is the surgeon. So, there's two Asuski [Olsewskis]. . . . Dr. Asuski [Olsewski] at Montefiore Hospital.

hearing, ALJ Feuer noted that he did not have Dr. Olsewski's records:

> ATTY: She's currently waiting on authorization for back surgery and right knee surgery. Both of those are pending.
>
> ALJ: Do we have the requests in the records?
>
> ATTY: I don't know if it was, let me see –
>
> ALJ: I don't think so.
>
> . . .
>
> ALJ: . . . I want authorization for surgery.
>
> ATTY: Yeah, I'm looking in the comp file now.
>
> CLMT: Dr. Asuski [Olsewski].[50]
>
> ALJ: I don't have that, and I don't have it for the back or the knee.

(R. 50-51.) After the first hearing was concluded, the ALJ did obtain a number of additional medical records, some of which referred to Dr. Olsewski (R. 831, 832, 890, 930),[51] but Dr. Olsewski's records were not obtained. The records from Dr. Olsewski, a physician treating Plaintiff's lumbar spine, undoubtedly are relevant to the ALJ's determination regarding the ability of Lindo to perform sedentary work. Moreover, as discussed above, Plaintiff's referral to Dr. Olsewski in March 2015, which came after Dr. Walsh's October 2013 finding that Plaintiff was capable of sedentary work, may support other evidence discussed below that Plaintiff's condition declined over time. In his decision, ALJ Feuer made no mention of Dr. Olsewski or his records.

The references to Dr. Olsewski by Plaintiff during her testimony, as well as her medical

---

(R. 67-68.)

[50] As noted earlier (see footnote 43, supra), the name "Olsewski" is misspelled in the hearing transcripts as "Asuski."

[51] ALJ Feuer's decision cites to Exhibit 14F, which is one of the documents citing to various records, forms and consultation reports by Dr. Olsewski. (R. 34, 930.)

records, triggered an obligation for ALJ Feuer to further develop the record. *See Umansky v. Apfel*, 7 F. App'x 124, 127 (2d Cir. 2001) (finding that "the ALJ did not adequately fulfill his obligation to develop the record" where other medical records regarding RFC were available); *Corona v. Berryhill*, No. 15-CV-07117, 2017 WL 1133341, at *16 (E.D.N.Y. Mar. 24, 2017) (finding ALJ did not satisfy duty to develop record where ALJ took no action to ensure record was complete beyond discussing missing treatment notes with counsel on record and leaving record open for submission of records); *Corporan v. Comm'r of Soc. Sec.*, No. 12-CV-06704, 2015 WL 321832, at *21 (S.D.N.Y. Jan. 23, 2015) ("The ALJ did not fulfill his duty to develop [Plaintiff's] record. First, the ALJ did not attempt to procure the pertinent medical records that very likely exist but are missing from the administrative record."). Yet, there is no evidence that ALJ Feuer requested or pursued any records from Dr. Olsewski.

Plaintiff's counsel's erroneous representation at the second hearing that the record was complete (*see* R. 77) did not discharge the ALJ of his duty, because the ALJ previously had relied upon a like misrepresentation that turned out to have been false;[52] even after the second representation that the record was complete, more records were obtained;[53] and there clearly were gaps in the record.[54] *See Concepcion v. Colvin*, No. 12-CV-06545, 2014 WL 1284900, at *14 (S.D.N.Y. Mar. 31, 2014) (counsel's affirmative response that the record was complete "does not

---

[52] "ALJ: . . . I thought I asked whether the record was complete here. ATTY: Well, I thought it was." (R. 66.)

[53] "At the continuance hearing, Exhibits 1A-2A, 1B-13B, 1D-11D, 1E-19E and 1F-14F were entered into evidence without objection. Exhibits 14B to 15B, 20E to 22E, and 15 to 16F were transmitted after the hearing." (R. 29.)

[54] For example, Dr. Katz (discussed in Background Section III.Q., *supra*) relied upon the following records from Dr. Olsewski: "Initial consultation report dated 04/30/2015, by John M. Olsewski, M.D." "EC-4NARR form dated 05/19/2015, by Dr. John Olsewski" "Follow-up visit report dated 06/04/2015, by John M. Olsewski, M.D." and "C-4 AUTH form dated 06/05/2015, by John M. Olsewski, M.D." (R. 930.)

change the analysis, since, in the face of clear gaps in information, the ALJ has an independent

duty to develop the record"); *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 346 (E.D.N.Y.

2010) ("Where, as here, it is apparent from the face of the record that the record lacks necessary

information, the ALJ cannot be relieved of his affirmative obligation to develop the record by a

statement of counsel.").

On remand, the ALJ shall develop the record by obtaining medical records from Dr.

Olsewski. There also are medical records from Dr. David Adin[55] and one MRI report[56] that should

be obtained on remand.

### III.   The ALJ's RFC Finding That Plaintiff Could Perform Sedentary Work Is Not Supported By Substantial Evidence

An opinion is supported by substantial evidence if the ALJ reviews the totality of the

evidence. *See Cabassa v. Astrue*, No. 11-CV-01449, 2012 WL 2202951, at *15 (E.D.N.Y. June 13,

2012) (remanding a case for further administrative proceedings in order for ALJ to "[r]eview the

totality of the evidence in the record"). An ALJ may not selectively rely upon some records, but

not others, to draw his conclusions. *Poles v. Colvin*, No. 14-CV-06622, 2015 WL 6024400, at *4

(W.D.N.Y. Oct. 15, 2015) ("Because these conclusions, which were key to the ALJ's rejection of

---

[55] Dr. Galano's December 6, 2016 independent orthopedic examination report submitted for Appeals Council review referred to the following medical records that are not in the administrative record:

- Initial evaluation report by Dr. David Adin, DO from New York Spine and Pain Care, PC dated 11/1/13.
  * * *
- Doctor's progress report by Dr. David Adin, MD dated 7/13/15.
- Follow up evaluation report by Dr. David Adin, DO from New York Spine and Pain Care, PC dated 7/13/15.

(R. 11-12.)

[56] Dr. Katz's report also made reference to an "MRI report of the lumbar spine" by Michele Greco, dated May 18, 2015, which is not part of the Administrative Record.

Plaintiff's claim, are improperly based on a selective citation to, and mischaracterization of, the record, the Court finds that the ALJ's decision does not provide an adequate basis for meaningful judicial review, and is not supported by substantial evidence.").

The only explicit evidence in the record that Plaintiff can sit for six hours in an eight-hour work day is the October 2013 opinion of Dr. Walsh, and the third opinion of consultative examiner, Dr. Meisel. However, in light of evidence indicating that Plaintiff's condition may have deteriorated after October 2013, the Court finds that the ALJ's RFC determination is not supported by substantial evidence.

Dr. Walsh examined Plaintiff four times between May 2013 and July 2014. In his first report, dated May 20, 2013, Dr. Walsh opined that Lindo had sustained a "lumbar spine sprain/strain," which was resolved. (R. 351.) After her re-examination on October 21, 2013, Dr. Walsh changed his diagnosis slightly, opining that Plaintiff's lumbar spine injury was "resolved with residuals." (R. 357.) Dr. Walsh also opined that "Lindo is capable of working sedentary duties at this time with restrictions to be placed on no bending, kneeling, squatting or climbing stairs." (R. 357.) It is this opinion by Dr. Walsh that the ALJ stated "partially inform[ed] the residual functional capacity" assigned by the ALJ "at the time [the opinion] was given." (R. 35.)

Plaintiff was reexamined by Dr. Walsh again on March 31, 2014. Although Dr. Walsh again opined that Plaintiff's lumbar spine injury was "resolved with residuals," he amended his opinion as to Plaintiff's ability to work, finding that she was "capable of working with restrictions to be placed on no climbing stairs, no bending and no heavy lifting over 25 lbs." (R. 868.) Plaintiff was last seen by Dr. Walsh on July 7, 2014, at which time his diagnosis changed again, to a "resolving" lumbar spine strain. (R. 795.)

Later, in January 2015, Plaintiff began weekly physical therapy sessions with Dr. S.R. Walters. After more than three months of physical therapy, Dr. Walters noted on March 26, 2015 that her spinal injury was "severe" and had been "exacerbated" such that she was "unable to sit" and referred her to Dr. Olsewski for spinal surgery. (R. 805.) ALJ Feuer did not address Dr. S.R. Walters' physical therapy notes but accorded little weight to Dr. S.R. Walters' January 2015 IM Consult Report which diagnosed Lindo with a lumbar spine strain and disc herniation, finding his stated limitations inconsistent. (R. 35.)

Over the course of several examinations in 2015, close in time to Dr. S.R. Walters' referral of Plaintiff to Dr. Olsewski, Plaintiff's treating chiropractor, Dr. McGee, determined that Plaintiff had the capacity for "less than sedentary work." (R. 601.) Together, this evidence indicates that Plaintiff's condition deteriorated after Dr. Walsh's October 2013 opinion that Plaintiff could perform sedentary work.[57]

Thus, notwithstanding the deference owed to the ALJ's findings, in view of evidence after October 2013 showing the potential that Plaintiff's condition deteriorated, the Court finds that the ALJ's RFC determination is not supported by substantial evidence. *See Camille v. Colvin*, 104 F. Supp. 3d 329, 343 (W.D.N.Y. 2015), *aff'd*, 652 F. App'x 25 (2d Cir. 2016) ("medical source opinions that are 'conclusory, stale, and based on an incomplete medical record' may not be substantial evidence to support an ALJ finding" (citation omitted)).

To the extent that the ALJ relied upon Dr. Meisel with respect to Plaintiff's sitting capacity, Dr. Meisel's opinions do not constitute substantial evidence. Dr. Meisel, a consultative examiner,

---

[57] While chiropractors are not afforded the deference of a treating physician, their opinions are nevertheless "important in the medical evaluation." *Losquadro*, 2012 WL 4342069, at *14.

gave three different opinions regarding Plaintiff's sitting limitations. Dr. Meisel's first opinion stated that Plaintiff could sit up to 30 minutes in an eight-hour day (R. 842), his second opinion stated Plaintiff could sit for up to three hours in an eight-hour day (R. 956), and his third opinion stated Plaintiff could sit for up to six hours in an eight-hour day. (R. 963.) The ALJ speculated as to the reason for the differences in Dr. Meisel's opinions (R. 37 ("The variation between the three medical source statements may indicate a lack of facility with the forms")) and selectively accorded partial weight to the conclusion that Plaintiff was capable of sitting for six hours in an eight-hour period. (R. 37.) The ALJ erred by failing to reconcile the significant differences among Dr. Meisel's three opinions. "An ALJ's failure to reconcile materially divergent RFC opinions of medical sources is also a ground for remand." *Torres v. Astrue*, No. 11-CV-05260, 2013 WL 802440, at *11 (E.D.N.Y. Mar. 5, 2013).

ALJ Feuer relied upon Dr. Meisel's last opinion in support of his RFC, finding "the most recent form is the most consistent opinion with the record evidence, relative to Dr. Meisel's other two attempts." (R. 37.) But, an ALJ "cannot simply selectively choose evidence in the record that supports his conclusions." *Gecevic v. Sec'y of Health & Human Servs.*, 882 F. Supp. 278, 286 (E.D.N.Y. 1995) (citations omitted). ALJ Feuer essentially cherry-picked the conclusion he agreed with most from the three differing Dr. Meisel opinions. Cherry-picking "refers to improperly crediting evidence that supports findings while ignoring conflicting evidence from the same source . . . suggest[ing] a serious misreading of evidence, or failure to comply with the requirement that all evidence be taken into account, or both." *Dowling v. Comm'r of Soc. Sec.*, No. 14-CV-00786, 2015 WL 5512408, at *11 (N.D.N.Y. Sept. 15, 2015); *Younes v. Colvin*, No. 14-CV-00170, 2015 WL 1524417, at *8 (N.D.N.Y. Apr. 2, 2015) ("an administrative law judge must

have a sound reason for weighting portions of the same-source opinions differently").

## CONCLUSION

For the foregoing reasons, Plaintiff's motion is GRANTED, the Commissioner's cross-motion is DENIED, and this action is remanded for further proceedings, pursuant to sentence four of 42 U.S.C. § 405(g).

DATED:      September 30, 2019
            New York, New York

_____

**STEWART D. AARON**
**United States Magistrate Judge**